[Cite as *State v. Williams*, 2016-Ohio-4550.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 15AP-48 |
| | | (C.P.C. No. 12CR-5824) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Maxamillion J. Williams, | : | |
| Defendant-Appellant. | : | |

---

### D E C I S I O N

Rendered on June 23, 2016

---

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee. **Argued:** *Sheryl L. Prichard*.

**On brief:** *Siewert & Gjostein Co., LPA*, and *Thomas A. Gjostein*, for appellant. **Argued:** *Thomas A. Gjostein*.

---

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, Maxamillion J. Williams, from a judgment of sentence and conviction entered by the Franklin County Court of Common Pleas following a jury trial in which the jury returned verdicts finding him guilty of aggravated murder, kidnapping, aggravated robbery, and tampering with evidence.

{¶ 2} On October 31, 2012, a Franklin County Grand Jury returned an indictment against co-defendant Dartanian Hawkins, charging him with two counts of aggravated murder, one count of kidnapping, and one count of aggravated robbery. On November 15, 2012, a Franklin County Grand Jury returned an indictment against appellant, charging him with two counts of aggravated murder, in violation of R.C. 2903.01, one count of

murder, in violation of R.C. 2903.02, one count of aggravated robbery, in violation of R.C. 2911.01, one count of kidnapping, in violation of R.C. 2905.01, and one count of tampering with evidence, in violation of R.C. 2921.12.  The indictments arose out of the strangulation death of Michael Payne on October 19, 2012.

{¶ 3}  The cases were tried jointly to a jury beginning December 9, 2014.  In the early morning hours of October 20, 2012, Whitehall Police Sergeant Rex Adkins received a dispatch regarding the discovery of a body "wrapped in trash bags," lying on "the roadway on Eastway Court," in Whitehall. (Tr. Vol. I at 57.)  Upon arriving at the scene, Sergeant Adkins checked the body and detected no pulse.  Law enforcement personnel subsequently identified the victim as Michael Payne, a Whitehall resident.

{¶ 4}  Whitehall Police Detective Steven Brown, who was assigned as lead detective on the case, arrived at the scene that morning and observed a "body was at the curb, and it appeared to be naked with the top half covered by one trash bag and the bottom half by another."  (Tr. Vol. I at 70.)  Later that morning, Detective Brown spoke with the victim's parents, who provided the detective with the name "Amy Lambert," a "woman who is said to be his girlfriend, who he had been seeing for years and who had recently gotten out of jail after doing four years."  (Tr. Vol. I at 79.)  Payne's parents "were immediately suspicious of her."  (Tr. Vol. I at 79.)   The last time they saw their son was on "the previous day, Friday the 19th, around 12:30 in the afternoon," as he was "getting into his Yukon and Amy was in the vehicle."  (Tr. Vol. I at 79.)  Lambert "appeared to be hiding in the front seat," knowing that "the parents don't like her."  (Tr. Vol. I at 79.)

{¶ 5}  Payne's parents provided the detective information regarding an apartment complex where Lambert "was last known to be staying."  (Tr. Vol. I at 79.)  Detective Brown also learned that Payne had purchased a life insurance policy with American Family Insurance in the amount of $100,000, naming Lambert as the sole beneficiary.

{¶ 6}  Detectives subsequently located the victim's Yukon at an apartment complex and observed trash bags in the cargo area.  Detective Brown described the trash bags in which the victim's body had been wrapped as "very unique.  They were a metallic silver with a bright blue tie, not the typical black or white trash bags."  (Tr. Vol. I at 81.)  Detectives observed "one of those trash bags" in the back of the Yukon, which

"immediately led us to believe that this vehicle and/or Amy had something to do with the murder."  (Tr. Vol. I at 81.)

{¶ 7}  Detectives drove to an apartment building located on East Livingston Avenue where they observed a female following a male down the stairwell of the building. The male was carrying a large black trash bag and a smaller grocery bag.  One of the detectives approached the female and showed her a picture of Lambert; the woman "denied knowing her, and * * * identified herself as Faustina."  (Tr. Vol. I at 84.)  After further questioning, the woman admitted she was Lambert.

{¶ 8}  Detective Brown questioned the male, later identified as Jeffrey Bagley. Detective Brown showed the man the picture of Lambert, and the man "said he didn't know her."  (Tr. Vol. I at 85.)  The man appeared nervous, and Detective Brown placed him under arrest after learning that the woman at the scene was Lambert.  Detective Brown looked inside the black bag and "immediately saw * * * one of those silver-with-blue-tie trash bags, just like the body had been * * * dumped in."  (Tr. Vol. I at 86.)  Upon looking inside the grocery bag, the detective "could see a black garment with what looked to be blood on it."  (Tr. Vol. I at 86.)

{¶ 9}  Inside the bags, the detective observed what "appeared to be the clothing, shoes, from the victim."  (Tr. Vol. I at 92.)  The investigation revealed "attempts to clean the body of evidence."  (Tr. Vol. I at 92.)  Detectives found two pairs of latex gloves as well as "bowls and tooth brushes," and they noticed "a strong chemical odor like bleach."  (Tr. Vol. I at 92.)  Detectives learned that the victim's hands, following his death, had been soaked in bleach water and "the tooth brushes had been used to clean his fingernails in [an] attempt to hide potential evidence."  (Tr. Vol. I at 93.)  Detectives also found a computer cable cord "that was consistent with what our investigation had revealed was likely used to strangle Mr. Payne, so we were confident we had just found the murder weapon also."  (Tr. Vol. I at 92.)  They later compared the pattern of the metal mesh on the HDMI computer cable cord with markings on the neck of the victim, and "the markings on the neck * * * were consistent with this."  (Tr. Vol. I at 95.)

{¶ 10} Detectives found a variety of clothing, including "a Michigan sweatshirt, which Mr. Payne's parents had said he was likely to be wearing."  (Tr. Vol. I at 94.)  The clothing items "had been cut off of the victim."  (Tr. Vol. I at 94.)  Detectives found a

blood-stained blue blanket with a "Big Deals" store tag, as well as a pair of gray sweatpants containing a blood stain.  (Tr. Vol. I at 97.)   In Bagley's pant's pocket, detectives recovered a Wal-Mart receipt, dated October 20, 2012, for the purchase of a cleaning product, as well as a "Discover Card cut in half in the name of Michael Payne." (Tr. Vol. I at 104.)

{¶ 11} Detectives determined that Bagley was attempting to dispose of these items in a nearby dumpster at the time they encountered him.  A subsequent search of the dumpster revealed two silver trash bags containing "vinyl gloves, some plastic gloves, [a] plastic Baggie with paper bindles that indicated drug use, and * * * a handwritten document that was linked to [appellant]."  (Tr. Vol. I at 106.)

{¶ 12} Detectives recovered a receipt from a Big Deals store for the purchase of cleaning supplies on October 19, 2012, at 7:20 p.m.  Surveillance video from the store revealed that "[appellant] and Amy Lambert were in Deals making this purchase."  (Tr. Vol. I at 109.)  In the video, appellant was depicted wearing sweatpants "consistent with the sweatpants" detectives "found in the trash bag with the bloodstain on them."  (Tr. Vol. I at 110.)

{¶ 13} During the investigation, detectives obtained some property from Hawkins, including a pair of jeans with a blood stain on an inside pocket.  Detectives also recovered a black backpack belonging to Hawkins which contained an American Family Insurance vehicle insurance card in the name of Michael Payne, and a Reynoldsburg United Methodist Free Store membership card also in the name of Michael Payne.  Detectives recovered some of the items belonging to Hawkins, including the backpack, from the home of Robert Dalton's mother; the investigation indicated that Hawkins had been staying with Dalton, at the home of Dalton's mother, around the time of the murder. Detectives later learned that Robert Dalton was present at appellant's apartment when Payne was murdered.

{¶ 14} Following Lambert's initial arrest, detectives had not yet established her involvement, and she was released and "placed * * * with her grandfather" because "the story" she provided detectives was that she was in fear of appellant and Hawkins.  (Tr. Vol. I at 125.)   Several hours later, after obtaining additional information, detectives returned to the residence of Lambert's grandfather to place her under arrest.  Lambert,

however, "had left her grandfather's house, had stolen his vehicle and stolen his debit card." (Tr. Vol. I at 125.) Law enforcement personnel subsequently arrested Lambert in Miami, Florida, and she was transported back to Ohio.

{¶ 15} The day after the death of Payne, appellant "flew from Port Columbus to Miami where he got on a cruise ship." (Tr. Vol. I at 126.) The cruise ship made a stop in Cozumel, Mexico, and appellant "got off the cruise ship in Cozumel and did not reboard." (Tr. Vol. I at 126.) Law enforcement personnel subsequently arrested appellant in Mexico, and he was returned to the United States. Hawkins made arrangements to turn himself into police. Police detectives obtained cell phone records for Hawkins and appellant as part of the investigation.

{¶ 16} The Bureau of Criminal Investigation ("BCI") assisted the Whitehall Police Department with the homicide investigation. BCI agents collected 34 items from an apartment leased by appellant at the Embassy Plaza Apartments, located on East Livingston Avenue. At trial, BCI Agent Stephanie Herron identified silver trash bags with blue ties found in the apartment similar to the bags used to wrap the victim's body. Agents also found fingernail clippers, scissors, a payment voucher for a Yukon, a credit/debit card in the name of Michael Payne, a firearm, and latex gloves. Agents collected items from the Yukon, including a white blanket with bloodstains and a silver trash bag. Agent Herron subsequently examined the victim's body, noting that the victim's fingernails had been clipped "all the way back to the quick," and that "one of his fingernails was clipped back so far that there was a little bit of blood." (Tr. Vol. II at 221.)

{¶ 17} Dalton, age 22, testified that he grew up with Hawkins in Columbus. Hawkins stayed with Dalton at the home of Dalton's mother during an approximately two-month period near the time of the events at issue. Hawkins had nicknames of "D" or "Tain." (Tr. Vol. II at 243.) Dalton knew appellant through Hawkins.

{¶ 18} Dalton gave the following account of the events on October 19, 2012. That morning, Dalton was at appellant's apartment where he had spent the previous evening. Also present at the apartment were Lambert, appellant, Bagley, Payne, and an individual with the nickname "Duke." (Tr. Vol. II at 246.) Hawkins had been at the apartment that morning but left to visit his girlfriend. Lambert introduced Payne as her fiancé. Payne

was only at the apartment for approximately 15 minutes, and he left with Lambert.  Bagley and Duke also left the apartment that morning.

{¶ 19} Later, Lambert returned to the apartment "and got [appellant].  And [appellant] was getting ready to go with her."  (Tr. Vol. II at 248.)  Lambert and appellant told Dalton "to stay, they would be right back there.  They were going to get [Hawkins]."  (Tr. Vol. II at 248.)  Later, as he was alone in the apartment, Dalton heard the sound of a male screaming outside the apartment.  Lambert came inside the apartment "looking for something."  (Tr. Vol. II at 251.)  Hawkins, appellant, and Payne then entered the apartment.  Hawkins and appellant were "fighting" Payne, and Payne did not want to come inside.  (Tr. Vol. II at 252.)

{¶ 20} Hawkins and appellant managed to force Payne inside, and they closed the door.  Hawkins and appellant "were jumping him."  (Tr. Vol. II at 253.)  The two men took Payne down the hallway toward the bathroom.  Dalton remained on the couch during this time because he "was scared."  (Tr. Vol. II at 254.)  Inside the bathroom, Hawkins and appellant "put a backpack over [Payne's] head, [and] continued to beat him."  (Tr. Vol. II at 254.)  The two men were "punching and kicking" Payne.  (Tr. Vol. II at 254.)  Lambert was "running around the house," helping Hawkins and appellant, and she took a cord from behind a television.  (Tr. Vol. II at 255.)

{¶ 21} At one point, Payne was down on the floor while Hawkins was strangling him with a cord.  Payne was "trying to push him off of him, fight[ing] back."  (Tr. Vol. II at 257.)  Payne "[f]ought hard," but eventually stopped and appeared to be unconscious.  (Tr. Vol. II at 257.)  While Payne was on the ground, Lambert removed Payne's wallet from his back pocket and began sorting through it.  After Payne was strangled, Lambert "clipped his nails.  She said he scratched her."  (Tr. Vol. II at 258.)  Dalton was told to "mind my business, stay out of it."  (Tr. Vol. II at 258.)

{¶ 22} Approximately one hour after the incident, Bagley and Duke arrived at the apartment.  Later that evening, Bagley drove Hawkins and Dalton to the residence of Dalton's mother.  Hawkins remained at the Dalton residence until the following morning, when he "packed up his stuff, and * * * left."  (Tr. Vol. II at 260.)  Police officers spoke with Dalton approximately one week following the incident.  Dalton initially told the

officers he had not been a witness to the murder. After the officers indicated they did not believe him, Dalton "told the truth." (Tr. Vol. II at 261.)

{¶ 23} Bagley, age 34, acknowledged several prior convictions, as well as past drug problems, including heroin use in 2012; Bagley purchased heroin from appellant during that time. Bagley stole items from retail stores, such as "Lowe's," to pay appellant for heroin. (Tr. Vol. II at 329.)

{¶ 24} On the morning of October 19, 2012, Bagley was at appellant's residence when he met David Hawkins, who Bagley also referred to as "Uncle Duke." (Tr. Vol. II at 330.) Bagley and David Hawkins (hereafter "David") left the apartment and drove to Marysville, where Bagley committed store thefts in order to pay for drugs. Bagley and David left Marysville, but Dublin police officers stopped their vehicle a short time later. Bagley received a ticket for driving without a license, and the officers impounded his vehicle. Bagley and David returned to appellant's apartment by bus later that night, arriving at approximately 7:00 p.m.

{¶ 25} When they arrived, Hawkins was "surprised, like * * * just caught * * * by surprise me being there with [David]." (Tr. Vol. II at 335.) Bagley then observed "part of the body that was laying in the hallway." (Tr. Vol. II at 336.) The victim was wearing a Michigan sweatshirt, and "his head was wrapped in a book bag." (Tr. Vol. II at 336.) Bagley knew that the victim was "[Payne], Amy's boyfriend," who had been at the apartment earlier in the day. (Tr. Vol. II at 336.) Hawkins was holding a gun in his hand, and he told Bagley "to help." (Tr. Vol. II at 337.)

{¶ 26} A short time later, appellant and Lambert arrived at the apartment with a blanket and rubber gloves. Appellant, Hawkins, and Lambert went into the bathroom and held a discussion. Appellant came out of the bathroom and said to Bagley: "Man, you know, can't say nothing, man. You know, I need you to help me out." (Tr. Vol. II at 338.) Bagley was scared, and appellant told Bagley that he "needed to help * * * get rid of the body." (Tr. Vol. II at 338.) Appellant first asked Bagley to drive Hawkins and another individual (Dalton) to a residence. During the trip, Hawkins said to Bagley: "Don't tell, man. I want to watch my kids grow up." (Tr. Vol. II at 341.)

{¶ 27} After dropping off Hawkins and his companion, Bagley returned to appellant's apartment. David was arguing with Lambert, "telling her that she was a piece

of crap and * * * that she was cold hearted and all * * *.  He was just cussing her out."  (Tr. Vol. II at 342.)  At one point, Lambert said "[Payne] got what he deserved."  (Tr. Vol. II at 376.)  Lambert was also "talking about getting money from [Payne] having an insurance policy and that it was coming to her and that she would give everybody a little bit of money if they just kept their mouth shut."  (Tr. Vol. II at 345.)  Lambert "kept saying that * * * when she gets the money, she's going to * * * make sure everybody gets some money."  (Tr. Vol. II at 345.)

{¶ 28} That evening, Bagley gave appellant a ride to the home of appellant's mother to pick up a passport and documents for a cruise appellant was taking to Jamaica.  During the drive, appellant said to Bagley: "Don't tell, man.  If anything happens, don't tell, man.  I got you, you know, when I get back.  Ain't got a lot of money right now."  (Tr. Vol. II at 345.)  They then returned to appellant's apartment.

{¶ 29} Later that evening, Lambert removed the clothing from Payne, and she and David wrapped the body in a blanket.  Appellant moved the Yukon to the back of the apartment near a side door.  Bagley, David, and Lambert then carried the body outside and placed it in the Yukon.  Lambert told Bagley that he needed to deposit the body "at a certain apartment in Whitehall off Broad Street to make it look like a robbery."  (Tr. Vol. II at 339.)  Bagley drove the vehicle by himself and left the body "at that apartment complex."  (Tr. Vol. II at 377.)  Bagley then drove to a Wal-Mart to purchase some cleaning supplies.  He returned to the apartment, where Lambert was placing items inside a trash bag, including clothes, a bowl, and a credit card.  All four individuals then left the apartment; David left on foot, while Bagley, Lambert, and appellant drove to the airport to drop off appellant.

{¶ 30} On the trip to the airport, appellant told Bagley to watch over his apartment, and he again admonished Bagley not to say anything.  After dropping off appellant, Bagley and Lambert returned to appellant's apartment.  Lambert then "cleaned out the truck.  She wiped it down.  She had the trash bag already tied up and in the house."  (Tr. Vol. II at 350.)  Bagley and Lambert remained in appellant's apartment that evening, and "[w]e got high" on drugs.  (Tr. Vol. II at 351.)

{¶ 31} The next morning, Lambert told Bagley that "we got to get ready to leave, that [Hawkins'] going to be coming over."  (Tr. Vol. II at 351.)  Bagley exited the

apartment with the trash bag, and Lambert told him to "throw that in the trash while she goes to get the truck." (Tr. Vol. II at 351.) As Bagley walked outside, a police detective was standing there with "this book in his hand. And he asked me, 'Have you seen this person?' " (Tr. Vol. II at 351.) Bagley looked at the photograph. "It was Amy." (Tr. Vol. II at 351.) Bagley "told him no." (Tr. Vol. II at 351.) At that time, another detective "opened the door * * * and said, 'Grab him.' He grabs me. Puts me in handcuffs. He looks in the bag." (Tr. Vol. II at 351.) As they were talking, "[Hawkins] came walking up. He went in the building, and then he came back out" and immediately left the area. (Tr. Vol. II at 352.)

{¶ 32} At the time of his arrest, Bagley was wearing a hoodie that belonged to appellant, and officers "found the credit card in the pocket belonging to that [Payne] guy." (Tr. Vol. II at 352.) Initially, Bagley did not tell detectives everything he knew because he was "scared." (Tr. Vol. II at 352.) Bagley spoke with Detective Brown on a second occasion and "told him the truth." (Tr. Vol. II at 354.)

{¶ 33} David, age 61, also goes by the name "Duke" or "Uncle Duke." (Tr. Vol. II at 394.) He knows Hawkins as "Tain." (Tr. Vol. II at 394.) David's sister adopted Hawkins. David knows appellant as "Max." (Tr. Vol. II at 395.)

{¶ 34} On the morning of October 19, 2012, David was at appellant's apartment, having spent the prior evening there. David accompanied Bagley to Marysville that morning, unaware that Bagley intended to steal items from a store. After first stopping at a Lowe's store, they then drove to a Home Depot. Bagley "comes running out with a spool of wire," and "[o]ne of the customers followed him." (Tr. Vol. II at 399.) Dublin police officers subsequently stopped Bagley's vehicle. The officers had the vehicle towed because Bagley did not have a valid driver's license.

{¶ 35} David and Bagley eventually returned to appellant's apartment that evening by bus, arriving at approximately 7:00 p.m. Hawkins let the two men inside the apartment. A "light-skinned" male was also in the apartment with Hawkins. (Tr. Vol. II at 407.) Upon entering, David observed "a body on the floor" in the hallway. (Tr. Vol. II at 403.) The victim's head was positioned "toward the living room and his feet * * * pointing straight down the hall." (Tr. Vol. II at 403.) The victim was wearing a Michigan sweatshirt, and his head was covered "in a book bag." (Tr. Vol. II at 404.) David "couldn't

believe it," and he walked "over there to look." (Tr. Vol. II at 404.) He "pulled the bag back and looked at his face." (Tr. Vol. II at 404.) The victim's left eye was swollen shut, and "he had been beat in the face." (Tr. Vol. II at 404.) There was a cord wrapped around the victim's neck. David was told to "go sit down and watch TV and, if I see anything, don't even pay no attention." (Tr. Vol. II at 405.) Hawkins was holding a gun at the time.

{¶ 36} Approximately 45 minutes later, appellant and Lambert arrived at the apartment with cleaning supplies, including a carpet cleaner. David testified that Lambert "went into a little act[,] * * * she's preaching to a dead man." (Tr. Vol. II at 407.) David related that "[s]he was like, 'How you like that, Michael,' you know, and 'I hope you appreciate it now.' And, 'What are you going to do now?' I mean, talking to him like he's alive." (Tr. Vol. II at 408.) Later, he observed appellant and Hawkins go into the bedroom. Hawkins and the light-skinned individual eventually left the apartment that evening.

{¶ 37} Appellant gave David five dollars and asked him to go with Lambert to purchase some gloves. David went with her because he was scared; after purchasing gloves at a nearby beauty store, they returned to the apartment and Bagley and Lambert began "cleaning up." (Tr. Vol. II at 411.) Lambert took scissors and cut off Payne's clothing. Lambert and Bagley wrapped Payne's body in a blanket, and David, Bagley, and Lambert carried the body down the hallway and out a back door, near the parked Yukon. Bagley then drove away with the body. Later, as the other individuals prepared to leave for the airport, David saw this as his opportunity to "get out of there," and he "left in a hurry." (Tr. Vol. II at 413.) David subsequently received a call from appellant, who was on a cruise ship. Appellant "wanted to know why did everybody find out what happened so fast." (Tr. Vol. II at 426.)

{¶ 38} Lambert, age 29, has prior convictions for felony theft, burglary, and identity theft. She entered into a proffer with plaintiff-appellee, State of Ohio, in the instant case, and subsequently entered a guilty plea with a joint recommendation for a 20-year sentence. Lambert first met Payne when she was 12 years old, after she was placed in foster care; Payne, who was 22 years old at the time, was "related to the foster-care people." (Tr. Vol. III at 448.) Payne "formed an attraction to me right away. He really liked me. So then we just hung out a lot." (Tr. Vol. III at 448.) Lambert later returned to

her mother's custody, but remained in contact with Payne. After Lambert turned 18, her relationship with Payne "was always the same. He just always helped me out and gave me money and always wanted to be with me." (Tr. Vol. III at 451.) Payne gave Lambert money "[b]ecause he liked me." (Tr. Vol. III at 451.) Lambert, who began using drugs at age 12, needed money to pay for drugs and clothing. Payne and Lambert never had sexual relations.

{¶ 39} Lambert eventually developed a heroin habit, "shooting heroin a lot throughout the day." (Tr. Vol. III at 453.) Lambert paid for her habit by stealing items from stores and then selling the items or returning them to the store in exchange for gift cards. She served a four-year prison sentence, from 2008 to 2012, for burglary and identity theft. While in prison, she remained in touch with Payne, who would do "[w]hatever I asked pretty much. He would give me money whenever I asked for it." (Tr. Vol. III at 455.)

{¶ 40} Lambert initially resided with her mother after her release from prison in February 2012. Payne provided money to Lambert through a paper route and a lawn care service. Payne also took out a life insurance policy in the amount of $100,000, naming Lambert as the beneficiary. Lambert told Payne that she would marry him someday, but she had no intention of doing so because she "wasn't in love with him." (Tr. Vol. III at 461.) Lambert acknowledged using Payne, and testified that she mentioned marriage "[t]o make him happy so that he would help me out more." (Tr. Vol. III at 462.)

{¶ 41} Several months after her release from prison, Lambert began using heroin again but did not tell Payne. Lambert often utilized Payne's Yukon for transportation. By October 2012, Lambert's heroin habit was "really bad," and she was also "smoking crack." (Tr. Vol. III at 467.) Lambert no longer lived at her mother's residence, and she "bounced around a lot" at different locations, eventually staying with appellant. (Tr. Vol. III at 468.) Appellant sold heroin and crack to her, and Lambert began a sexual relationship with him. Payne was unaware of this relationship, or that she was residing with appellant. At the time, Lambert was spending approximately $200 per day on her heroin habit, but later began consuming $400 to $500 per day of heroin. Lambert was again stealing to support her habit, and also received money from Payne. Eventually, Lambert had difficulty paying appellant for the drugs.

{¶ 42} Once, while Lambert and appellant were riding in the Yukon, appellant "said if I didn't pay him, he would just kill Michael. And I was joking, when I said, 'If you do that, you'll just do me a favor.' And he was like, 'Oh, yeah, the policy.' " (Tr. Vol. III at 474.) Approximately one week later, appellant "said something like, you know, 'I could take care of that for you. I could * * * help you with that.' And I was like, 'okay.' " (Tr. Vol. III at 475.) Lambert, however, did not think he was "too serious about it." (Tr. Vol. III at 475.) Appellant brought the subject up a third time, and Lambert "realized that he was being serious about it. And I agreed upon it." (Tr. Vol. III at 475.) When appellant suggested killing Payne to obtain the insurance money, Lambert thought "it just sounded like a good idea." (Tr. Vol. III at 476.)

{¶ 43} Lambert told appellant that it would have to look like an accident. Initially, appellant was "going to have somebody else do it." (Tr. Vol. III at 476-77.) Lambert did not discuss the details with appellant because "that was kind of more his thing." (Tr. Vol. III at 477.) Appellant was planning to leave for a cruise on October 20, 2012, and he "wanted to get it done before the cruise, and * * * it wasn't really -- a really good, set-out plan." (Tr. Vol. III at 478.) Lambert "wasn't supposed to have anything to do with it, but in the end [she] had lots of involvement in it." (Tr. Vol. III at 478.)

{¶ 44} On October 18, 2012, Lambert spent the night at appellant's apartment. Other individuals were at the apartment, including David, Bagley, and Hawkins, who Lambert referred to as "Tain." (Tr. Vol. III at 480.) On the morning of October 19, "the plan was to get [Payne] over to the house. I didn't really know too much after that." (Tr. Vol. III at 481.) Lambert "didn't know it was going to happen at the apartment." (Tr. Vol. III at 482.)

{¶ 45} Lambert left the apartment and went to the residence of Payne's parents. Payne came outside and they drove to appellant's apartment because "[appellant] wanted [Payne] there." (Tr. Vol. III at 484.) They remained at the apartment for a while, but Payne "had seen the [drug] scales [appellant] had out, and he kind of knew what was going on. And he didn't want to be over there." (Tr. Vol. III at 485.) Payne got up and walked out of the apartment. Lambert ran after Payne because she "needed to get him back to [appellant's] apartment." (Tr. Vol. III at 486.) Lambert found Payne, and they drove to a bank "to get his money pulled out." (Tr. Vol. III at 486.) They got into an

argument because "he didn't want to give me money."  (Tr. Vol. III at 486.)  Lambert was upset because she needed money to pay appellant.  Lambert told Payne she was using drugs again, and that she needed money for a medication to treat heroin addiction.

{¶ 46} After the argument they drove back to appellant's apartment and Lambert attempted to get Payne back inside the apartment, but he refused.  Lambert ran up to the apartment and told appellant, who responded: " 'Well, you got to.'  So I was like, 'All right.' "  (Tr. Vol. III at 489.)  Lambert thought she might be able to "drug him so that he would be asleep so we could get him up in the apartment."  (Tr. Vol. III at 489.)

{¶ 47} Lambert then returned to the Yukon, and Payne and Lambert ran some errands.  Later, when Payne was out of the vehicle for a short time, Lambert placed some sleeping pills in his soft drink.  Lambert and Payne then drove to a Wendy's restaurant; as they sat in the parking lot, Payne fell asleep briefly and Lambert attempted to "poke him with a needle" containing heroin, but "he felt it, and he woke up."  (Tr. Vol. III at 493.)  Lambert later told Payne that she wanted to "get my stuff out of the apartment."  (Tr. Vol. III at 496.)

{¶ 48} They drove back to appellant's apartment, and Lambert went inside and told appellant that she "can't get him up here."  (Tr. Vol. III at 497.)  Lambert stated that appellant responded: "Well, get him in the apartment building at least."  (Tr. Vol. III at 497.)  Earlier in the day, appellant had asked Lambert "if it was okay if it was [Hawkins] that did it.  And I said yeah."  (Tr. Vol. III at 497.)  Appellant "needed to go get [Hawkins] from * * * his girlfriend's house * * * in Whitehall, so he asked me if we could go pick up [Hawkins], and I said yes."  (Tr. Vol. III at 497.)  Lambert went downstairs and asked Payne "if we could go pick up [Hawkins]."  (Tr. Vol. III at 498.)  Payne agreed, and drove Lambert and appellant to a residence in Whitehall to pick up Hawkins.  After returning to appellant's apartment, Hawkins and appellant exited the Yukon and went upstairs; Lambert remained in the vehicle with Payne because he did not want to go inside.  Lambert, however, "grabbed the keys out of the truck so he couldn't leave."  (Tr. Vol. III at 500.)

{¶ 49} Lambert then said: "Okay.  Well I'm going to go up there and get my stuff.  Will you help me at least carry my stuff out?"  (Tr. Vol. III at 500.)  Payne "said he would."  (Tr. Vol. III at 500.)  Payne got out of the vehicle but refused to go upstairs.  Lambert

went upstairs to the apartment, and Dalton was inside. Appellant informed Lambert that "[Hawkins] wanted to strangle him because he's never strangled anybody before." (Tr. Vol. III at 501.) Lambert said "okay." (Tr. Vol. III at 501.) She "turned around and looked, like, 'Here, use this.' Like, I was * * * looking for something to grab. And he said he had it. He's like, 'No, we got it. It's okay.' " (Tr. Vol. III at 501.)

{¶ 50} Lambert went outside and told Payne to "[c]ome up here and help me carry this stuff. It's heavy." (Tr. Vol. III at 502.) Lambert and Payne walked upstairs together, and "when we get up there, [appellant] grabs him." (Tr. Vol. III at 502.) Appellant had a gun in his hand, and he told Payne to "get in the house," but Payne "started struggling right away." (Tr. Vol. III at 502.) Lambert put her hand over Payne's mouth "because he was trying to make noise." (Tr. Vol. III at 503.) Lambert saw Hawkins look out the door, and she told him to "come here and help. So he came out and grabbed [Payne] too." (Tr. Vol. III at 503.) Appellant and Lambert were able to get Payne inside "with [Hawkins'] help." (Tr. Vol. III at 503.)

{¶ 51} Once inside, Hawkins and appellant took Payne down the hallway to the bathroom. Hawkins had a gun in his hand at the time. Payne "struggled the whole time." (Tr. Vol. III at 504.) Appellant "had gotten the money from out of [Payne's] pocket," and "he came out counting it out of the bathroom." (Tr. Vol. III at 505.) As Payne struggled, Hawkins and appellant kept pushing him back inside the bathroom. Appellant returned to the bathroom, but Payne managed to get out into the hallway.

{¶ 52} Lambert then observed "[Hawkins] in the hallway with [Payne] with the cord around [Payne's] neck." (Tr. Vol. III at 507.) Lambert asked Hawkins and appellant if they wanted her to help get him to the ground, and "[Hawkins] said yes." (Tr. Vol. III at 508.) Lambert "helped take his legs out so they could get him to the ground." (Tr. Vol. III at 508.) Appellant started kicking Payne; he "[k]icked him quite a few times. And [Hawkins] even had to tell him that was enough. Then he stopped." (Tr. Vol. III at 508.) Hawkins was "strangling him" with the cord; "[t]he way it was tied, he pulled it. And it was choking him, tight around his neck." (Tr. Vol. III at 509.) Payne "was struggling," but he eventually "gave up" and "just laid there." (Tr. Vol. III at 510.) Hawkins "[j]ust continued to strangle him[,] * * * it felt like it took forever." (Tr. Vol. III at 510-11.)

According to Lambert, Hawkins "enjoyed looking into [Payne's] eyes while he passed away." (Tr. Vol. III at 511.)

{¶ 53} Dalton was sitting on the couch during the incident. After Hawkins finished strangling Payne, "[appellant] was really pumped up and excited." (Tr. Vol. III at 512.) Lambert then cut Payne's fingernails and cleaned them because she "thought he had scratched me." (Tr. Vol. III at 514.) Lambert "didn't want my DNA on his fingers." (Tr. Vol. III at 514.)

{¶ 54} That evening, appellant and Lambert went to a "Deals" dollar store to purchase cleaning supplies "to clean up the apartment." (Tr. Vol. III at 515.) They purchased a quilt, trash bags, a floor brush, all purpose cleaner, and bleach. At trial, Lambert identified photographs introduced by the state depicting her and appellant inside the store on the evening of October 19, 2012. The state also introduced a video taken from the store on that date, and Lambert identified herself and appellant in the video. When appellant and Lambert returned from the store, Bagley and David were at the apartment. Appellant and Dalton left the apartment together that evening. Later, Lambert cut Payne's clothing off because she "didn't want there to be any fibers on his clothes in the apartment." (Tr. Vol. III at 519.) They wrapped Payne's body in a blanket and trash bags.

{¶ 55} Lambert wanted Bagley to "dump" the body near some apartments in a "bad neighborhood" so it might appear "he got robbed or something." (Tr. Vol. III at 521.) Bagley drove away in the Yukon with the body. Later, Bagley and Lambert drove appellant to the airport. Lambert and Bagley returned to appellant's apartment and "[u]sed some more drugs." (Tr. Vol. III at 523.) Appellant "had left me and [Bagley] with some heroin, and we just kind of sat and chilled." (Tr. Vol. III at 523.)

{¶ 56} Lambert testified that "[David] was kind of acting fidgety about everything," and she mentioned to appellant that they should probably "do something to take care of him because [she] thought he was going to tell." (Tr. Vol. III at 524.) Lambert meant that they should "kill him because I thought he was going to tell. And [appellant] agreed. And he told me to call [Hawkins]." (Tr. Vol. III at 524.)

{¶ 57} Lambert called Hawkins the next day, and "he was coming over." (Tr. Vol. III at 524.) Lambert told Bagley that they needed to dispose of the "cord, clothes, just

everything." (Tr. Vol. III at 524.) As Bagley was taking a trash bag outside, they encountered Whitehall police detectives. Lambert told detectives her name was "Faustina Friley. And then they said no, now, you're Amy Lambert." (Tr. Vol. III at 525.) Detectives also detained Bagley. The apartment door was open, and detectives began to question Lambert about what had happened. She then "started crying and saying that they had kidnapped me and forced me to be a part of the whole thing." (Tr. Vol. III at 526.) Lambert told detectives that "[appellant] and [Hawkins] were responsible" for the murder, and she lied to them about her involvement. (Tr. Vol. III at 526.)

{¶ 58} Initially, detectives believed Lambert was not involved, and they arranged for her to stay at her grandfather's residence. After her grandfather went to sleep that evening, Lambert "stole his car and some money from him, and * * * left." (Tr. Vol. III at 527.) Lambert fled the state, traveling with a woman named Michelle. Lambert spoke on the phone with appellant, and he told her to "pick him up in Florida," and she "said okay." (Tr. Vol. III at 528.) Law enforcement personnel subsequently arrested Lambert in Florida.

{¶ 59} Dr. Kenneth Gerston, a forensic pathologist with the Franklin County Coroner's Office, conducted the autopsy of Payne and prepared an autopsy report. Dr. Gerston testified that the cause of death was ligature strangulation, and the "manner" of death was "homicide." (Tr. Vol. III at 539.) He defined "ligature" as "a kind of a string or a cord that is usually used around the victim's neck to cut off circulation of blood to the brain or from the brain or both." (Tr. Vol. III at 539.)

{¶ 60} At trial, he identified autopsy photographs taken of the victim. Dr. Gerston noted a "ligature furrow" on the victim's neck, which he described as "an impression made on the skin by some type of cord." (Tr. Vol. III at 543.) The physician noted three furrows, indicating that "the string or cord used to produce these marks was wrapped around his neck three times." (Tr. Vol. III at 543.) Dr. Gerston found evidence of blunt force injury to the victim's face, including a black eye and a contusion to the forehead and neck area, consistent with being punched or kicked. Dr. Gerston also noted possible nail marks, suggesting that "[t]he victim would be struggling." (Tr. Vol. III at 544.) Dr. Gerston testified that the contusions would have been inflicted before death. Dr. Gerston noted a hemorrhage to the anterior (front part) of the victim's neck muscles, indicating a

great amount of force. Dr. Gerston identified state's exhibit No. H-16, a cord, as the type of instrument consistent with the injury to Payne.

{¶ 61} Sarah Smith, a DNA analyst with BCI, conducted analysis of items recovered in this case, including a gray HDMI cord, a pair of gray sweatpants, and a pair of jeans. A DNA profile taken from the HDMI cable was consistent with a sample taken from the victim. A blood stain on the sweatpants was consistent with the victim's DNA, as well as DNA linked to Lambert and appellant. A blood stain on the jeans was found to be consistent with the victim's DNA.

{¶ 62} Appellant, age 20, testified on his own behalf. His nickname is "Max." (Tr. Vol. IV at 695.) Appellant has known Hawkins his "whole life." (Tr. Vol. IV at 698.) In October 2012, appellant resided at the Embassy Plaza Apartments. Appellant sold heroin "basically to make a living." (Tr. Vol. IV at 699.) He also "funded theft rings." (Tr. Vol. IV at 699.)

{¶ 63} Appellant met Payne in August 2012 "through" Lambert." (Tr. Vol. IV at 700.) Payne "would pay a fair share of [Lambert's] debt * * * on a weekly or biweekly basis." (Tr. Vol. IV at 700.) Appellant knew about Payne's life insurance policy. According to appellant, in late September or early October 2012, Lambert mentioned to him that " '[Payne] has that policy out on me.' * * * And she's like, 'Well, I want to kill him for the money, and I want you to * * * do it.' " (Tr. Vol. IV at 702-03.) Appellant testified that his response was: "Hell no." (Tr. Vol. IV at 703.) Lambert raised the issue "[q]uite a few times * * * over the span of the next couple weeks." (Tr. Vol. IV at 703.)

{¶ 64} Appellant gave the following account of events on October 19, 2012. That morning, a number of individuals were at his apartment, including Lambert, Payne, Bagley, David, and Dalton. Lambert came into appellant's room about noon "for me to give her some dope." (Tr. Vol. IV at 705.) Later in the afternoon, around 3:00 or 4:00 p.m., "she came back again to buy some more dope." (Tr. Vol. IV at 705.) Dalton was still at the apartment "[c]hilling, smoking weed, hanging out, and drinking." (Tr. Vol. IV at 706.) Appellant denied knowing anything about a plan to kill Payne.

{¶ 65} That afternoon, "[Hawkins] had called me and said he was * * * trying to come back over to the house." (Tr. Vol. IV at 707.) Appellant testified that "[Lambert] walks in a little later. And I go outside with [Lambert] and * * * asked [Payne] to go take

me over somewhere to pick up my brother."  (Tr. Vol. IV at 707.)  By brother, appellant was referring to Hawkins.  Payne agreed to take them to pick up Hawkins.  Appellant stated that he had a conversation in the vehicle with Payne in which Payne indicated he could not pay any money that day on behalf of Lambert.  Appellant "told him we would talk about it when I get back to the house."  (Tr. Vol. IV at 709.)  They returned to the apartment, and appellant had another conversation with Payne about money.  Appellant testified that "[i]t didn't affect me if he paid then and there or not."  (Tr. Vol. IV at 710.)  Appellant denied pulling a weapon on Payne, and he did not "recall" having a weapon at the time.  (Tr. Vol. IV at 710.)

{¶ 66}  Appellant denied forcing Payne inside his apartment.  When asked on direct examination as to how Payne ended up inside his apartment, appellant testified that Lambert "was standing at the doorway while me and [Payne] was talking, and she just started going off[,] * * * like, 'F you, [Payne] I need my money now.  No, I need my money now.' * * * And then [Hawkins] came * * * out of the apartment."  (Tr. Vol. IV at 712.)  Appellant testified that Hawkins had a weapon and "walked [Payne] in the house."  (Tr. Vol. IV at 712.)  According to appellant, Hawkins, Payne, and Lambert were involved in "a bit of a struggle."  (Tr. Vol. IV at 713.)  Appellant stated he was "walking in * * * directly behind them."  (Tr. Vol. IV at 713.)  Dalton was inside the apartment sitting next to a computer.  Appellant testified that Lambert, Hawkins, and Payne "just walked into the bathroom."  (Tr. Vol. IV at 715.)  According to appellant, he sat down in the living room and he could not see what was going on inside the bathroom because "[t]he door was closed."  (Tr. Vol. IV at 717.)  He heard "a few noises" coming from the bathroom, describing it as "[a] bit of hollering," and that it "sounded like a scuffle."  (Tr. Vol. IV at 717.)

{¶ 67}  Appellant testified that he got up and started walking toward the bedroom "to grab me a cigar, I smoke weed."  (Tr. Vol. IV at 718.)  As he was "coming back down the hallway, everybody bust[ed] out the bathroom."  (Tr. Vol. IV at 718.)  According to appellant, "[t]hey just all three came out.  Like basically all three just came out at once."  (Tr. Vol. IV at 718.)  Appellant testified that "[Lambert] was trying to punch [Payne].  And [Hawkins] had * * * some cord wrapped around him."  (Tr. Vol. IV at 719.)  Appellant related that he "made it back to the couch" by the time Payne ended up on the ground.

(Tr. Vol. IV at 720.)  Appellant stated that "[Lambert] just * * * started kicking [Payne], just kicking him, kicking him.  And [Hawkins] just continued doing what he was doing." (Tr. Vol. IV at 720.)  When asked on direct examination whether he did anything to stop the fight, appellant responded: "No, I didn't. * * * I mean, I know it was my apartment and all, but * * * I didn't want nothing to do with it."  (Tr. Vol. IV at 720-21.)

{¶ 68} After it became clear that Payne was dead, appellant "rolled another blunt. And I let * * * my brother know it was all right, you know.  Let him know everything was all right and told him I was going to take care of everything for him."  (Tr. Vol. IV at 721.) Appellant stated he did not "physically help out" with cleaning the apartment, but he "bought the cleaning supplies and blanket and stuff like that."  (Tr. Vol. IV at 723.)   He instructed Lambert, Bagley, and David about cleaning up the apartment.  Appellant stated that he "did drive the truck to the back of the building and held the door open" while the body was loaded.  (Tr. Vol. IV at 724.)

{¶ 69} Early the next morning, appellant went to the airport and took a flight to Miami for a cruise trip with family members.  When the cruise ship docked in Cozumel, Mexico, appellant learned there was a warrant for his arrest.  Appellant "just didn't get back on the boat."  (Tr. Vol. IV at 727.)  He "wasn't ready to deal with all of this."  (Tr. Vol. IV at 727.)  According to appellant, "once I got off the boat, I was like just wait it out.  It will blow over."  (Tr. Vol. IV at 727.)  He was arrested in Mexico a few days later.

{¶ 70} On cross-examination, when asked whether state's exhibit No. C-116 was his weapon, appellant responded: "You could say it's mine, but it's more like of a house gun." (Tr. Vol. IV at 731.)  When asked why he did not contact police after the murder, appellant said: "I ain't want to get nobody in trouble.  You know, I just thought we would put everything behind us."  (Tr. Vol. IV at 742.)  Appellant acknowledged he attempted to call Hawkins around 5:00 p.m. on the date of the incident.  When asked why he kept calling him, appellant responded: "That was for directions.  He gave horrible directions."  (Tr. Vol. IV at 753.)

{¶ 71} Following deliberations, the jury returned verdicts finding appellant guilty of aggravated murder (both counts), kidnapping, aggravated robbery, and tampering with evidence.  The jury also returned verdicts finding Hawkins guilty of aggravated murder (both counts), kidnapping, and aggravated robbery. By judgment entry filed

December 23, 2014, the trial court sentenced appellant to life in prison without parole on the merged murder counts, and ten years each on the aggravated robbery and kidnapping counts, as well as three years on the tampering with evidence count. The court ordered all counts to run concurrently to each other.

{¶ 72} On appeal, appellant sets forth the following three assignments of error for this court's review:

> FIRST ASSIGNMENT OF ERROR
>
> TRIAL COURT VIOLATED THE APPELLANT'S RIGHT TO A FAIR TRIAL UNDER THE SIXTH AMENDMENT AND DUE PROCESS UNDER FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE 1 OF THE OHIO CONSTITUTION IN COMMITTING SUBSTANTIAL PREJUDICE BY DENYING THE DEFENDANT-APPELLANT'S REQUEST FOR THE JURY TO BE INSTRUCTED ACCORDING TO OHIO JURY INSTRUCTIONS (OJI) ON AIDER AND ABETTOR WHEREIN MERE PRESENCE OF THE ACCUSED IS NOT ENOUGH.
>
> SECOND ASSIGNMENT OF ERROR
>
> THE TRIAL COURT IMPROPERLY SENTENCED THE APPELLANT TO LIFE WITHOUT PAROLE USING FOR ITS SOLE SUPPORTING REASON, ON THE RECORD, A PERCEIVED LACK OF REMORSE OF THE APPELLANT DURING HIS TESTIMONY AT TRIAL, WHICH WAS INCONSISTENT WITH ITS SENTENCE ENTRY WHEREIN IT STATED THAT THE PURPOSES AND PRINCIPLES OF R.C. §2929.11 WERE CONSIDERED, AS WELL AS, THE FACTORS SET FORTH IN R.C. §2929.12, §2929.13 AND §2929.14 WERE WEIGHED.
>
> THIRD ASSIGNMENT OF ERROR
>
> APPELLANT'S CONVICTION WAS NOT SUPPORTED BY THE SUFFICIENCY OF THE EVIDENCE IN VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 1 & 16 OF THE OHIO CONSTITUTION AND THE CONVICTION WAS ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 73} Under his first assignment of error, appellant contends the trial court erred in denying his request to instruct the jury on aider and abettor as set forth in the Ohio Jury Instructions.  According to appellant, the trial court's instruction, over trial counsel's objection, essentially instructed the jury that his mere presence at the scene was sufficient to convict him as an aider and abettor.

{¶ 74} In general, "[t]he giving of jury instructions is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion." *State v. Taylor,* 5th Dist. No. 12CA18, 2013-Ohio-5751, ¶ 34, citing *State v. Martens,* 90 Ohio App.3d 338 (3d Dist.1993).  Thus, in reviewing a trial court's jury instruction, an appellate court "determines whether the trial court abused its discretion in refusing to give a requested instruction under the facts and circumstances of the case." *State v. Brunner,* 10th Dist. No. 15AP-97, 2015-Ohio-4281, ¶ 31.  Further, we review jury instructions "as a whole." *Taylor* at ¶ 34.

{¶ 75} R.C. 2923.03 states as follows:

> (A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
>
> (1) Solicit or procure another to commit the offense;
>
> (2) Aid or abet another in committing the offense;
>
> (3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;
>
> (4) Cause an innocent or irresponsible person to commit the offense.

{¶ 76} At trial, defense counsel objected to the prosecutor's proposed jury instruction on aiding and abetting, arguing that "[t]he one proffered by the prosecuting attorney * * * makes it sound as though the jury could convict on mere presence."  (Tr. Vol. IV at 779.)  The trial court overruled the objection, finding the proposed instruction "is a correct statement of law.  It's actually part of the instructions earlier, that it has to be one who aids, assists, encourages, cooperates."  (Tr. Vol. IV at 781.)

{¶ 77} The trial court subsequently instructed the jury in part, as follows:

> One or both Defendants may be convicted as a principal offender or as a complicitor or as an aider and abettor to any or all counts of the indictment.
>
> Before you can find one or both Defendants guilty of a crime as a complicitor or aider and abettor, you must find beyond a reasonable doubt that on or about the 19th day of October, 2012, in Franklin County, Ohio, the Defendant under consideration solicited or procured another to commit the offense or aided or abetted another in committing the offense with the same knowledge or purpose as required by the offense under consideration.
>
> An indictment charging a Defendant as a principal offender also charges the Defendant with aiding and abetting that crime. An aider or abettor is one who aids, assists, encourages, cooperates with, advises, or incites another to commit a crime and participates in the commission of the offense by some act, word, or gesture.
>
> Aid means to help, assist, or strengthen.  Abet means to encourage, counsel, incite, or assist.
>
> A common purpose among two or more people to commit a crime cannot be shown by positive evidence, but may be inferred from circumstances surrounding the act and from Defendant's subsequent conduct. Criminal intent may be inferred from the presence, companionship, and conduct before and after the offense is committed.  In addition, mere presence can be enough if it is intended to and does aid in the primary offense.  Both -- aid the primary offender.

(Tr. Vol. IV at 853-54.)

{¶ 78} Appellant contends that language in the last sentence of the above-quoted instruction essentially informed the jury that his mere presence at the scene was sufficient for the jury to find him guilty as an aider and abettor.  Appellant cites the general rule in Ohio that mere presence at the scene is insufficient to show complicity. *See, e.g.*, *State v. Jackson*, 8th Dist. No. 51924 (May 14, 1987) (The defendant's "[m]ere presence at the scene will not suffice to demonstrate complicity. * * * The state must prove that the accused encouraged or participated in the commission of the crime.").

{¶ 79} Upon review, we find no abuse of discretion by the trial court. As quoted above, the trial court instructed the jury that an aider and abettor is one who "aids, assists, encourages, cooperates with, advises, or incites another to commit a crime and participates in the commission of the offense by some act, word, or gesture." (Tr. Vol. IV at 854.) The court also instructed the jury that "[a]bet means to encourage, counsel, incite, or assist." (Tr. Vol. IV at 854.)

{¶ 80} With respect to the "mere presence" language, as noted by the state, the trial court's instruction did not simply state that mere presence was enough to convict as a complicitor; rather, the court instructed the jury that it "can be enough if it is intended to and does aid in the primary offense." (Tr. Vol. IV at 854.) *See, e.g., Langford v. Warden*, S.D.Ohio No. 2:12-CV-0096 (Feb. 7, 2013) (noting that "[e]ven the specific language to which [defendant] objected - that 'mere presence can be enough it if is intended to and does aid the primary offender' - told the jury that more than presence (*i.e.* the fact that the complicitor's presence actually aided the primary offender) was needed in order to convict").

{¶ 81} Here, viewing the instruction as a whole, we find that the trial court's instruction adequately informed the jury that more than mere presence was required to render one an aider and abettor. Accordingly, appellant's first assignment of error is not well-taken and is overruled.

{¶ 82} Under his second assignment of error, appellant contends the trial court erred in sentencing him to life without parole based on a perceived lack of remorse. Citing comments by the trial court during the sentencing hearing, appellant maintains that any expression of remorse on his part would have sabotaged any chance of acquittal as it would have been perceived as a showing of culpability. Appellant further contends the trial court made no mention of his lack of criminal history or violent past, and that the court's sentence failed to follow the principles and purposes of sentencing under R.C. 2929.11, 2929.12, 2929.13, and 2929.14.

{¶ 83} R.C. 2953.08(G)(2) states as follows:

> The court hearing an appeal under division (A), (B), or (C) of this section shall review the record, including the findings underlying the sentence or modification given by the sentencing court.

> The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:
>
> (a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;
>
> (b) That the sentence is otherwise contrary to law.

{¶ 84} In *State v. Marcum*, _____ Ohio St.3d ____, 2016-Ohio-1002, ¶ 1, the Supreme Court of Ohio recently clarified that an appellate court, in reviewing a felony sentence, "need not apply the test set out by the plurality in *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912." Rather, "appellate courts must adhere to the plain language of R.C. 2953.08(G)(2)." *Marcum* at ¶ 7. Thus, "an appellate court may vacate or modify a felony sentence on appeal only if it determines by clear and convincing evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law." *Id.* at ¶ 1.

{¶ 85} R.C. 2929.11(A) provides that "[a] court that sentences an offender for a felony shall be guided by the overriding purposes of felony sentencing," which are "to protect the public from future crime by the offender and others and to punish the offender." Pursuant to R.C. 2929.12(A), the trial court "has discretion to determine the most effective way to comply with the purposes and principles of sentencing set forth in [R.C.] 2929.11." R.C. 2929.12(A) requires a sentencing court "to consider the applicable seriousness and recidivism factors outlined in R.C. 2929.12(B), (C), (D) and (E)" in exercising its discretion "to determine the most effective way to comply with the purposes and principles of sentencing outlined in R.C. 2929.11." *State v. Arnett*, 88 Ohio St.3d 208, 213 (2000). Further, the "catchall provision in R.C. 2929.12(A) also permits the sentencing judge to consider 'any other factors that are relevant to achieving those purposes and principles of sentencing.' " *Id.*, citing R.C. 2929.12(A).

{¶ 86} During the sentencing hearing in the instant case, the trial court cited the "egregious" nature of the crime, characterizing it as a "senseless * * * killing that had no good reason * * * at all." (Tr. Vol. IV at 910.) The court noted that appellant "is intelligent, and I believe he has a strong family support. And that makes it even worse. That makes it even harder to understand why he would get involved in this kind of stuff." (Tr. Vol. IV at 910.) The trial court further commented that it "[d]oes not appear that he had any remorse. That's what I got from his testimony. And as has been mentioned already, the overriding purposes of the sentencing statutes is to punish and protect." (Tr. Vol. IV at 910.) Based on the record presented, the trial court determined that "life without parole is the proper sentence here." (Tr. Vol. IV at 910-11.)

{¶ 87} Pursuant to R.C. 2929.12(D)(5), a trial court may consider whether the offender "shows no genuine remorse for the offense." *See also State v. Nutter,* 3d Dist. No. 16-01-06 (Aug. 24, 2001) ("Pursuant to R.C. 2929.12(D)(5), a defendant's lack of genuine remorse is a factor that indicates a likelihood that he or she will commit future crimes, while R.C. 2929.12(E)(5) deems an expression of genuine remorse as a factor indicating that recidivism is not likely.").

{¶ 88} As noted, appellant argues the trial court erred in citing lack of remorse, i.e., appellant maintains that any showing of remorse at trial would have undercut his testimony claiming innocence. Under Ohio law, however, "[l]ack of genuine remorse is an appropriate consideration for sentencing, even for a convicted defendant who maintains his or her innocence." *State v. Roseberry,* 7th Dist. No. 11 BE 21, 2012-Ohio-4115, ¶ 8. *See also State v. Black,* 4th Dist. No. 12CA3327, 2013-Ohio-2105, ¶ 64 ("a trial court may consider lack of remorse in sentencing a defendant, even if the defendant maintains his innocence through sentencing"). Moreover, "[t]he trial court is in the best position to determine the genuineness of the remorse expressed by a defendant." *State v. Chike,* 11th Dist. No. 2001-L-120, 2002-Ohio-6912, ¶ 12.

{¶ 89} Further, the trial court's judgment entry sentencing appellant states in part: "The Court has considered the purposes and principles of sentencing set forth in R.C. 2929.11 and the facts set forth in R.C. 2929.12. In addition, the Court has weighed the factors as set forth in the applicable provisions of R.C. 2929.13 and R.C. 2929.14." This court has "previously held that similar language in the trial court's judgment entry defeats

a claim that the trial court failed to consider the purposes and principles of felony sentencing as set forth in R.C. 2929.11 and 2929.12." *State v. Saur,* 10th Dist. No. 10AP-1195, 2011-Ohio-6662, ¶ 40, citing *State v. Daniel,* 10th Dist. No. 05AP-564, 2006-Ohio-4627, ¶ 50, *State v. Braxton,* 10th Dist. No. 04AP-725, 2005-Ohio-2198, ¶ 27, and *State v. Sharp,* 10th Dist. No. 05AP-809, 2006-Ohio-3448, ¶ 6.

{¶ 90} Based on this court's review, we cannot clearly and convincingly find that the record does not support the trial court's findings under the relevant statutes or that the sentence is otherwise contrary to law. Accordingly, we overrule appellant's second assignment of error.

{¶ 91} Under his third assignment of error, appellant challenges his convictions as not supported by sufficient evidence and as against the manifest weight of the evidence. Appellant asserts that the testimony of the state's witnesses was not reliable, and also contends that the jury could have been prejudiced by the fact the that trial court ordered appellant and Hawkins, his co-defendant, to be shackled after an outburst by Hawkins at trial.

{¶ 92} In *State v. Martin,* 10th Dist. No. 14AP-189, 2014-Ohio-4447, ¶ 19-20, this court noted the distinction between sufficiency and manifest weight claims as follows:

> In reviewing the "record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' "
>
> In contrast to a sufficiency argument, a reviewing court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact." Rather, an appellate court "must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."

(Citations omitted.)

{¶ 93} As indicated, the jury returned verdicts finding appellant guilty of aggravated murder, kidnapping, aggravated robbery, and tampering with evidence. In

addition to instructing the jury as to each of the elements of those offenses, the trial court also instructed the jury (as previously noted in addressing appellant's first assignment of error) on aiding and abetting.

{¶ 94} R.C. 2911.01 defines the offense of aggravated robbery as follows: "No person, in attempting or committing a theft offense, * * * or in fleeing immediately after the attempt or offense, shall * * * [i]nflict, or attempt to inflict, serious physical harm on another." R.C. 2905.01 sets forth the offense of kidnapping, and provides in part: "No person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of another person * * * [t]o facilitate the commission of any felony or flight thereafter." R.C. 2921.12(A) defines the offense of tampering with evidence as follows: "No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any * * * thing with purpose to impair its value or availability as evidence in such proceeding or investigation."

{¶ 95} The offense of aggravated murder is defined under R.C. 2903.01. Pursuant to R.C. 2903.01(A): "No person shall purposely, and with prior calculation and design, cause the death of another." R.C. 2903.01(B) states in part: "No person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, [or] aggravated robbery."

{¶ 96} We first consider appellant's sufficiency challenge, in which we construe the evidence in the light most favorable to the prosecution. At trial, the state's primary evidence with respect to appellant's alleged participation in the death of Payne came from the testimony of Lambert and Dalton. Lambert testified as to her relationship with appellant, including the fact he sold her heroin. Lambert either stole items from retail stores or obtained money from Payne in order to support her drug habit. Lambert, who was using as much as $400 to $500 worth of heroin on a daily basis, soon encountered difficulty paying appellant.

{¶ 97} Appellant was aware of a life insurance policy Payne had purchased naming Lambert as the sole beneficiary, and Lambert testified as to several discussions she had with appellant during which he suggested killing Payne to collect on the policy. During

these discussions, appellant told Lambert he could "take care of that" for her. (Tr. Vol. III at 475.) At first, Lambert thought appellant was not serious, but after he brought the subject up on a third occasion, she realized he was "serious about it," and Lambert "agreed upon it." (Tr. Vol. III at 475.) Appellant, who was planning to leave for a cruise on October 20, 2012, "wanted to get it done before the cruise." (Tr. Vol. III at 478.) The plan was to lure Payne to appellant's apartment the day before appellant was to leave the country.

{¶ 98} On October 19, 2012, appellant instructed Lambert to bring Payne up to appellant's second floor apartment. Lambert testified that appellant asked her earlier that day "if it was okay if it was [Hawkins] that did it," and Lambert agreed. (Tr. Vol. III at 497.) Lambert was able to convince Payne to drive to appellant's apartment, but Payne did not want to go inside. Lambert went inside and told appellant she could not get Payne to come upstairs. Appellant then told Lambert that he "needed to go get [Hawkins]," who was at his girlfriend's residence. (Tr. Vol. III at 497.) Payne agreed to drive Lambert and appellant to an address in Whitehall and, after picking up Hawkins, Payne drove them back to appellant's apartment complex. Appellant and Hawkins went inside, but Payne remained in the Yukon.

{¶ 99} Lambert went upstairs and informed appellant that Payne was reluctant to come inside. Appellant told Lambert that Hawkins "wanted to strangle him because he's never strangled anybody before." (Tr. Vol. III at 501.) Lambert responded: "[O]kay." (Tr. Vol. III at 501.) Lambert then went outside and asked Payne to come upstairs to help her carry some heavy items out of the apartment. Payne finally agreed to walk up the stairs with Lambert. When Payne reached the top of the stairs, appellant, who was holding a firearm, "grab[ed]" Payne and told him to "get in the house." (Tr. Vol. III at 502.)

{¶ 100} Payne immediately began struggling with appellant. Lambert put her hand over Payne's mouth "because he was trying to make noise." (Tr. Vol. III at 503.) Lambert observed Hawkins looking out the door, and she told him to help. Hawkins then came outside and "grabbed [Payne] too." (Tr. Vol. III at 503.) Appellant and Lambert were able to get Payne inside the apartment with the help of Hawkins. Appellant and Hawkins then forced Payne down the hallway to the bathroom. Appellant, who was able to get "the

money from out of [Payne's] pocket," came out of the bathroom "counting it." (Tr. Vol. III at 505.)

{¶ 101} During the struggle, Payne managed to exit the bathroom to the hallway area where Lambert observed Hawkins with a cord around Payne's neck. Lambert "helped take [Payne's] legs out so they could get him to the ground." (Tr. Vol. III at 508.) Appellant then started kicking Payne while Hawkins tied the cord around Payne's neck and began strangling him. Appellant kicked Payne "quite a few times," to the point that Hawkins "even had to tell him that was enough." (Tr. Vol. III at 508.) Payne struggled for a while, but eventually lost consciousness. Lambert testified that Hawkins "enjoyed" looking into Payne's eyes "while he passed away." (Tr. Vol. III at 511.) After Hawkins finished strangling Payne, appellant "was really pumped up and excited." (Tr. Vol. III at 512.)

{¶ 102} That evening, appellant and Lambert went to a "Deals" dollar store to purchase cleaning supplies. Later, Lambert informed appellant that David, who had arrived at the apartment following the murder, was "acting fidgety about everything," and Lambert thought they should "probably do something to take care of him," meaning that they should "kill him because I thought he was going to tell." (Tr. Vol. III at 524.) Appellant agreed, and told Lambert to call Hawkins.

{¶ 103} Dalton provided testimony consistent with Lambert's account. On the date of the incident, Dalton was at appellant's apartment when he heard the sound of a male screaming outside. Lambert came inside the apartment "looking for something." (Tr. Vol. II at 251.) A short time later, Hawkins and appellant forced Payne inside the apartment. Hawkins and appellant were "jumping" Payne, who did not want to come inside. (Tr. Vol. II at 254.) The two men forced Payne down the hallway to the bathroom; they then put a backpack over Payne's head and "continued to beat him." (Tr. Vol. II at 254.) Appellant and Hawkins were "punching and kicking Payne]." (Tr. Vol. II at 254.) A short time later, Dalton observed Payne on the floor, and Hawkins was strangling him with a cord. Payne "[f]ought hard" with his assailants but eventually stopped struggling and lost consciousness. (Tr. Vol. II at 257.)

{¶ 104} In addition to the eyewitness testimony of Lambert and Dalton, the state presented other testimony and physical evidence consistent with its theory of the case.

Bagley testified that he and David returned to appellant's apartment at approximately 7:00 p.m. on the evening of October 19, 2012, after traveling to Marysville earlier that day. When they entered the apartment, Hawkins was inside holding a weapon and he was "surprised" by their arrival. (Tr. Vol. II at 335.) Bagley observed the body lying in the hallway, and he knew the victim was Lambert's boyfriend.

{¶ 105} A short time later, appellant and Lambert entered the apartment with cleaning supplies. Appellant, Hawkins, and Lambert went inside the bathroom and held a discussion. Appellant came out of the bathroom and told Bagley: "Man, you know, can't say nothing, man. You know, I need you to help me out." (Tr. Vol. II at 338.) Appellant told Bagley that he "needed to help * * * get rid of the body." (Tr. Vol. II at 338.) That evening, while Bagley was giving appellant a ride to pick up a passport for his planned cruise, appellant told Bagley: "Don't tell, man. * * * I got you * * * when I get back. Ain't got a lot of money right now." (Tr. Vol. II at 345.) Later, Bagley drove the body to a location Lambert suggested "to make it look like a robbery." (Tr. Vol. II at 339.)

{¶ 106} David similarly testified that, upon returning to appellant's apartment that evening, Hawkins was inside the apartment holding a weapon. David looked down the hallway and observed a body on the floor. The victim's head was covered in a "book bag." (Tr. Vol. II at 404.) David pulled back the bag and observed that the victim "had been beat in the face," and a cord was wrapped around his neck. (Tr. Vol. II at 404.) Approximately 45 minutes later, Lambert and appellant entered the apartment with cleaning supplies. Appellant gave David some money and told him to go with Lambert to purchase some gloves; he accompanied Lambert because he was scared. David later helped Bagley and Lambert carry the body down the hallway and out a back door to the parked Yukon.

{¶ 107} Dr. Gerston, who performed the autopsy, testified that the cause of death was ligature strangulation. He noted three furrow marks on the skin, indicating that the instrument used to strangle the victim had been wrapped around the neck three times. Dr. Gerston cited blunt force injury to the victim's face, consistent with being punched or kicked. He also noted that nail marks near the victim's neck area suggested the victim "would be struggling" to loosen the cord. (Tr. Vol. III at 544.) Dr. Gerston testified that the injury was consistent with strangulation by the type of instrument admitted at trial

and identified by Lambert as the cord used to strangle Payne. Smith, a DNA analyst, testified that a DNA profile taken from the HDMI cable was consistent with a sample from the victim, and that a blood stain on the sweatpants was consistent with Payne's DNA as well as DNA linked to Lambert and appellant.

{¶ 108} Upon review of the testimony and other evidence presented, and construing the evidence most strongly in favor of the state as we are required to do in considering a sufficiency challenge, a rational trier of fact could have found the essential elements of the crimes proven beyond a reasonable doubt. Accordingly, we reject appellant's contention that there was insufficient evidence to support his convictions for aggravated murder, kidnapping, aggravated robbery, and tampering with evidence.

{¶ 109} With respect to appellant's manifest weight challenge, appellant contends that the testimony of Lambert, a known liar and drug addict, was not reliable. Appellant also suggests that defense counsel should have cross-examined Dalton more closely to challenge whether he was merely an innocent bystander.

{¶ 110} In reviewing a manifest weight challenge, "we are mindful that the original trier of fact is in the best position to judge the credibility of witnesses and is, therefore, better suited to determine the amount of weight to assign to a particular witness's testimony." *State v. Maag*, 3d Dist. No. 5-03-32, 2005-Ohio-3761, ¶ 48. Accordingly, "the determination of a witness's credibility is primarily left to the province of the jury." *Id.*

{¶ 111} In the present case, the jury was aware of Lambert's drug history and the fact that she lied to detectives about her involvement in the death of Payne at the time of her initial arrest. It was within the province of the jury to consider and evaluate her testimony and credibility, as well as the testimony and credibility of the other witnesses. In this respect, the jury also heard appellant's account of the events, and the trier of fact obviously credited the state's version. With respect to appellant's claim that Dalton may not have been a disinterested witness, we agree with the state that appellant's own trial testimony refutes this claim. Specifically, appellant testified that Dalton remained seated on the couch during the events at issue.

{¶ 112} Based on this court's review of the entire record, we cannot conclude that the jury lost its way and created a manifest miscarriage of justice in convicting appellant

of aggravated murder, kidnapping, aggravated robbery, and tampering with evidence. Accordingly, the verdicts are not against the manifest weight of the evidence.

{¶ 113} Appellant also contends that the jury may have been prejudiced when he and Hawkins were shackled following Hawkins' outburst during appellant's testimony. Appellant relies on *State v. Franklin*, 97 Ohio St.3d 1, 2002-Ohio-5304, ¶ 79, for the proposition that the use of restraints carries negative connotations that erode the presumption of innocence.

{¶ 114} As noted, appellant testified at trial on his own behalf. During direct examination, appellant's counsel questioned appellant regarding the actions he took after it became clear that Payne was dead. The record indicates the following response by appellant, as well as the subsequent outburst by Hawkins and exchange between Hawkins and the trial court:

> [APPELLANT] I just -- well, first things first, I just -- I rolled another blunt. And I let -- I let my brother know it was all right, you know. Let him know everything was all right and told him I was going to take care of everything for him, you know, just get up out of there.
>
> DEFENDANT HAWKINS: You're a mother fucking liar, brother. You're going to lie on me like that. You know you --
>
> THE COURT: You'll have to be quiet or you'll be taken out of the courtroom.
>
> DEFENDANT HAWKINS: Take me out then. I ain't about to sit up hear and listen to this. You lying ass, brother.

(Tr. Vol. IV at 721.)

{¶ 115} The trial court ordered co-defendant Hawkins removed from the courtroom following the above outburst. Appellant then resumed his testimony.

{¶ 116} Prior to closing arguments, the trial court made the following comments on record:

> THE COURT: * * * For the record, the Court was approached by --
>
> THE DEPUTY: Sergeant.

THE COURT: -- the sergeant and requested that the Defendants be handcuffed for the closing arguments, and the Court agreed. They'll be brought in before the jury. The jury won't know they have handcuffs on unless they want to show them to them. It's up to them. There's no reason for the jury to know it. And after the events of last Friday, I just felt better safe than sorry.

(Tr. Vol. IV at 777.)

{¶ 117} In response to the trial court's comments, counsel for Hawkins objected to "having him handcuffed during closing," arguing that he did not believe "there's a safety issue right now." (Tr. Vol. IV at 778.) Counsel for appellant joined in the objection. The trial court overruled the objection, noting that "there's no reason for the jury to know it unless he wants them to know it." (Tr. Vol. IV at 778-79.)

{¶ 118} The Supreme Court has held that a criminal defendant in a jury trial "has the right to remain free of physical restraints that are visible to the jurors." *State v. Jackson,* 141 Ohio St.3d 171, 2014-Ohio-3707, ¶ 153. That right, however, "may be overcome in a particular instance by the need for physical security, escape prevention, or courtroom decorum." *Id.* The decision whether to "impose such restraints is left to the trial court's sound discretion." *Id.*

{¶ 119} In response to appellant's arguments regarding the trial court's decision to order shackling, the state argues that the volatile outburst and clear tension between the two defendants sitting close to one another justified the actions taken by the court. The state further argues that the handcuffs were only on appellant and Hawkins during closing arguments, and there is no evidence that the jurors observed the handcuffs. On review, we agree.

{¶ 120} Here, the record indicates that, based on the earlier outburst by Hawkins, a sergeant approached the trial court about the use of handcuffs during closing argument, and the court agreed that such measures were justified. The court made clear that defendants would be brought in "before the jury," and that the jurors "won't know they have handcuffs * * * unless they want to show them." (Tr. Vol. IV at 777.) Thus, the trial court took precautions to prevent the jury from seeing defendants in restraints, and there is nothing in the record to suggest the jury became aware of the use of restraints during

closing argument. Based on the record before this court on appeal, appellant has shown neither abuse of discretion by the trial court nor resulting prejudice.

{¶ 121} Accordingly, appellant's third assignment of error is not well-taken and is overruled.

{¶ 122} Based on the foregoing, appellant's first, second, and third assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

DORRIAN, P.J., concurs.
BRUNNER, J., concurs.

BRUNNER, J., concurring.

{¶ 123} I concur with the decision of the majority and note that the jury instruction on "presence" referenced in appellant's first assignment of error is contained in the trial court's instruction defining, "common purpose among two or more people to commit a crime." (Tr. Vol. IV at 854.) The trial court stated that the requisite criminal intent for such common purpose "may be inferred from the presence, companionship, and conduct before and after the offense is committed. In addition, mere presence can be enough if it is intended to and does aid in the primary offense. Both -- aid the primary offender." (Tr. Vol. IV at 854.) The plan of the defendants in this matter was to commit the crime at the apartment of the appellant, and clearly, from the evidence adduced at trial, the trial court's instruction on "presence" was appropriate and sufficient. The facts in evidence support the trial court's instruction, since providing the apartment clearly aided in the primary offense.

{¶ 124} Therefore, for these additional reasons, like the majority, I find no abuse of discretion, and I concur with the decision of the majority overruling appellant's first assignment of error.

{¶ 125} I further concur with the decision of the majority overruling appellant's second assignment of error.

{¶ 126} As to appellant's third assignment of error, I note that it is often custom for counsel and others in the courtroom to rise to their feet and stand in a show of respect for the jury when its members enter the courtroom. Under such circumstances, if the

appellant remained seated, it could or could not be taken to reflect that he was shackled in some way; however, the record does not contain this level of detail nor reflect such circumstances. Therefore, I concur with the decision of the majority overruling appellant's third assignment of error as to his argument about being shackled for closing arguments.

{¶ 127} As to sufficiency and manifest weight of the evidence otherwise, I concur with the decision of the majority overruling appellant's third assignment of error.

_____